I wonder if the state's attorney and the public defender would both stand up and tell us who you are. Good morning, Mr. Williams. Matthew Connors on behalf of the people of the state of Illinois. And Mr. Connors? That's correct. Good morning. You're not on the brief? No, sir. Okay. Fifteen minutes per side. You've been here before, right? No, it's the first time. Oh, is this your first time? Yes, it is. Well, welcome to the appellate court, Mr. Williams. Thank you. Do you have a cheering section here? I do. Good. Okay. I would like to reserve three minutes. You have 15 minutes, and you can save out of that 15 minutes any question you wish for a response. We are not – we don't use our lights here. At least this panel does not use our lights. Okay. We will tell you when we've heard enough. Okay. But we'll give you at least the 15 minutes and sometimes more than that if we have questions about the case. Okay. And you can save out a portion for a response because you have a right to respond after the state addresses us. Okay. Okay. I would like to reserve three minutes. You may. If it would please the court opposing counsel, my client was convicted of first-degree murder after having a fistfight with a man whom he found in his apartment with his girlfriend. When you say fistfight, did the victim ever strike him? No, he did not. However, that doesn't make it not a fistfight, the fact that he did not strike him. Okay. So when you're describing fistfight, you're talking about one person hitting the other? Yes. However, that individual did attempt to hit Jones. Howell started the fight and Howell participated in the fight throughout. So Vontas testified that Howell pushed and punched at Jones throughout.  So the first is we would like, we ask this court to reduce Jones' conviction from murder to involuntary mass slaughter because he acted recklessly as opposed to intentionally or knowingly. Second, if this court should find that Jones acted knowingly, we ask that his conviction be reduced to second-degree murder based off of mutual combat. There are a number of factors which show that Jones did not have the requisite intent or knowledge. The first is that all three individuals who were present at the fight, Jones, Reyes, and Cervantes, all believed that Howell was alive when the fight ended. Didn't Mr. Cervantes make a rather vigorous attempt to interrupt the fight? No, he did not. He did not get a chance to interrupt the fight. At the time that the two individuals, Howell and Jones... Did he say anything about telling your client to stop or that's enough? Yes, and that was at the very end. And at that point, my client did stop. The very end, meaning just before the victim died? Yes. However, Cervantes was trying to, he had three dogs which he was trying to corral at that time. And he did say that the fight stopped and he said that Jones stopped immediately when he asked him to stop, to stop holding down Jones at that point. Jones was holding down Howell and Cervantes made an attempt to stop him and Jones stopped immediately when Cervantes came over to stop the fight. Cervantes testified that he came over and he pushed Jones off and that Jones stopped at that moment. He told Jones that he was going to call the police and that Cervantes at that moment believed that he was alive, that Howell was alive. He thought that he was breathing. So what does that tell us, that he thought he was alive? That tells us that Jones did not have the intent to kill. Why? Well, if he had the intent to kill, he would not have left, believing that Howell was still alive. Okay. Well, there's two different standards. Sure. There's an intent and there's also the knowledge. The knowledge that your acts create a strong probability of death or grave bodily harm. Now, in this case, the medical examiner didn't say that the fight had anything to do with the death. He said that this gentleman died of asphyxiation. Asphyxiation. And that the asphyxiation was caused or could have been caused by placing a foot on the gentleman's neck for only four seconds. Sure. But I think the medical examiner's testimony is very important in showing that this was not intent. What about the other knowledge? About knowledge. The medical examiner testified that he died from asphyxiation. However, he found a variety of bruises and scrapes on him, which shows that during the fight, and by the way, there's a long-standing testimony. Bruises and scrapes on the victim, not on the offender. Right. But he found scrapes and bruises on the victim, which shows that during the fight that there were no serious injuries suffered. There were no fractures, which would prove that he had the intent or the knowledge that he was causing grave bodily harm. What about the evidence of the foot?  Maybe kicking him in the neck. How about that? Well, those injuries didn't cause grave bodily harm. However, the medical – Wait, wait, wait. Wasn't there evidence that the foot to the neck caused the death? Yes. The medical examiner found particular hemorrhages to the front of the chest and also the neck. So if there was a foot here, didn't he kick him in the neck? No. Those he found to show that compression had been applied. He found bruises to the neck, which could have occurred during the fight. However, the particular hemorrhages corroborate Cervantes' and the defendant's assertions that he had only placed his foot there to hold him down. The medical examiner went on to say that – But isn't that evidence of knowledge that his acts could create bodily harm, grave bodily harm? No, absolutely not, if you take the rest of the medical examiner's testimony into account. He said that only 4.4 pounds of pressure could have caused the asphyxiation if it were only applied for approximately a minute. And on an individual as large as Howell, who was 370 pounds, this is not a lot of pressure at all. Also, the medical examiner said that – So it doesn't take a lot of pressure, but do you think that the trial court could have concluded that by placing his foot on this man's neck, that he had some knowledge or had the knowledge that his acts could create a strong probability of death or grave bodily harm? No, not in this instance because only 4.4 pounds of pressure was needed. And in that instance, it's not a practical certainty that death would be caused by holding someone down with only 4.4 pounds of pressure. Well, I don't know. I mean, I think that the question is, could the court conclude that putting your foot on someone's neck could cause death or grave bodily harm? I mean, I don't know that that's kind of far out there. I'm not talking about intent to kill. I'm talking about knowledge. We're talking about the knowledge. Yes. And I believe that under those set of facts that this is not – that was the wrong conclusion to make. Here, it was – the medical examiner testified that indirect pressure could cause the asphyxiation, that the pressure to the soft tissue areas could cause pressure to the jugular and the carotid arteries. How do we review the trial court's finding? What standard of review are we using to determine? Normally, a fact finder, in terms of the trial court, they're accorded great deference. But here, the trial court made findings of fact which – Well, this is a murder. So are we reviewing whether the state has proved the elements beyond reasonable doubt? Isn't that what we're looking at, if there's evidence that supports that finding? Yes. But here, the trial court made findings of fact which were directly refuted by the record. And under those circumstances, those findings of fact are not binding upon this court. And here, he made a finding, especially in the middle of making his holding that Jones committed murder, he found that he stood on his neck. And that was refuted by the evidence. Well, I don't know how you can say that because Cervantes' testimony is pretty much – this was really not a fight at all. It was a one-sided sort of situation in which the defendant struck the victim several times. And that when he was down, he was holding him with his foot at his neck. And then when Cervantes finally said, that's enough, he stopped. That's enough. And of course, the medical examiner said this quivering of the lips was consistent with him basically taking his last breaths. Yes, but the issue here is knowledge. And under the circumstances here, Jones had no knowledge that his actions were practically certain to cause Howe's death. Well, I don't know. I mean, this is a case where we're looking at what the judge did, whether there's any evidence that supports his conclusion that he did have knowledge that by stepping on someone's neck that you can cause great bodily harm or death. Yes, but that is not what he did here. There is no testimony, there is no evidence in the record that he stepped on his neck. Now, when you say that, do you mean there's no direct evidence? Is there any circumstantial evidence from which the court could infer that he had his foot on the victim's neck? The circumstantial evidence are – The evidence is that Cervantes testified that – and Cervantes was a state witness who was found credible when he testified that Jones kicked Howe when Howe was down. His testimony – there's never been any questions about his credibility. He always characterized the defendant's actions as holding Howe down. There's testimony that the officers who first on the scene, or the paramedics first on the scene got there at 6.27 p.m. and pronounced Howe dead. Was there any testimony as to when Jones interrupted whatever he was doing at Cervantes' request when he said, that's enough, got up and left? Do you remember – is there any testimony in the record as to what time that was? No. So we don't know how much time elapsed between the – Cervantes called 9-1-1. Is that in the record as to the time he called 9-1-1? I'm uncertain as to the exact time. Because when I looked at your recitation of the facts in your brief, you talk about approximately 6.22 for the arrival of the paramedics. There was no testimony from Cervantes. They got the assignment at 6.22. Can we assume that that was approximately when the 9-1-1 call was made? Yes. Okay. So we can infer then, I guess, that possibly this fight probably took place sometime after 6 o'clock. Yes. But that when Jones left, there was evidence that Howell was still alive. Yes, that Cervantes and Reyes all believed that he was alive, even to the point that after Jones and Reyes left the scene, Cervantes took the added step of going to get a water hose to provide for him. What was that all about? He believed that he was still alive. He thought that he was gasping. He testified that he thought that... Oh, he was going to bring him a drink of water? Yes, a whole pint of water. The pictures would show and corroborate his testimony. He told them to hold on tight, that the cops were on their way. You know, you do cite mutual combat cases, but the trial court pretty much rejected that. Even in your cases that you cite, mutual combat is described as a fight or struggle which both parties enter willingly, or where two persons upon a sudden quarrel and in hot blood mutually fight upon equal terms and where death results from the combat. This isn't a case where actually death resulted from combat, is it? I mean, this is... Yes, this is... Well, I thought it was asphyxiation. If this court were to find that Jones acted knowingly, then the issue would be if this was how a mutual combatant, and here I believe that that is very clear. There are two questions that need to be answered. Mutual combat when Jones admitted, this is Jones testifying himself now at the trial, and from your recitation, your traversal of the record in your brief, Jones admitted that Howell never hit him with his punches during the fight and that he was not physically hurt during the fight. Yes. But you're still insisting that this could be mutual combat. That it was mutual combat if you find that knowledge was present. Here, I believe that we have to take it one second at a time. Originally, Howell tried to get away. I mean, when they were up at the top of the stairs outside in the apartment, Howell fled. Howell fled. However, Howell fled on his own knowledge. He had never been threatened with violence, nor had he been hit or threatened with violence. Howell fled down the stairs. My client admitted that he jumped in front of him. At that point. Chased him down the stairs. Chased him down the stairs and jumped in front of him. Is there any testimony in the record about Howell? We've got testimony as to how big Howell was. Do we have any testimony? Jones was 240 pounds. 240? That's in the record? Yes. And taller? Well, the medical examiner's testimony was that Howell was 5'10". And Jones said that he was 5'5". Well, that Howell was 5'9". And Jones said that he was 5'10". However, the testimony from Jones and from Sir Barsky was that Howell was taller. Howell weighed about 100 pounds more. He weighed 130 pounds more. Okay. So when Howell reached the bottom of the stairs, at that point, Jones asked him who he was. He did not threaten him with violence, nor did he act violently towards him. At that point, Howell told him that he shouldn't fight with him because he was a police officer. And at that point, my client asked him to show him his badge. At that point, Howell swung on him. Howell started the fight. He entered the fight willingly. At that point, he could have simply have answered any questions and left. Okay. Furthermore, the fight was on fair terms. Didn't Cervantes testify that that's what it looked like, that this fellow, Howell, was trying to get away? Yes. He wasn't there to fight. He was trying to leave. He was trying to get away. He didn't say that. It never looked like he wanted to even be there. And, in fact, he never landed a single blow to Jones. Cervantes never testified that he didn't want to fight. Cervantes testified that he participated, he swung at Jones, and he attempted to push Jones. I would say that, in this particular instance, Howell had already threatened him about being a police officer. He had been challenged on to show his badge. Howell knew that he had just had sex with his ex-girlfriend, and here he was in the back of this chaotic situation in his backyard. He's late getting home to his wife and child. He outweighs this man by 130 pounds, and at that point submits to you that he was going to force his way out, and he swung. And he started this fight. The fight was on equal terms. He started the fight? Yes. Is that what you're? Yes. Jones' testimony is unrebutted in that Howell started the fight. The fight is definitely on equal terms. Howell and Jones were both unarmed. Jones never armed himself. That's a point in your favor, isn't it? There are very few cases that find murder in mutual combat where there's no weapon involved. No weapons involved. Jones never took the opportunity to take a weapon when he could have, when he was in the kitchen, nor did in that backyard with dangerous pit bulls. He didn't use those to his advantage either. What's missing here in the record of this case is the defendant finds somebody in his house having sex with his common-law wife. Nobody tried to prove that maybe he just lost it to try to get your voluntary manslaughter. Nobody came up with that kind of a theory. No, I mean, the theory at trial was that. Mutual combat. And also that this was a reckless behavior, that he had no knowledge that he would cause Howell's death simply by holding him down. You didn't argue that it was an act of passion. No. That would have been the first prong of a second-degree murder case, wouldn't it? It was murder, but the act of passion based on all of the circumstances reduced it to second-degree murder. You didn't make that argument? No, he made that argument as well. Okay. He didn't make that argument. All right. He argued both at trial. We agree with you. You know, we're going to have to find some evidence in the record. I'm sorry. We're going to have to find some evidence in the record that we can point to specifically to overrule the trial court. Who, if you admit it, is discretion in this particular case. I mean, he's the judge of the credibility of the witnesses. He heard Jones. He heard Cervantes. He heard the young lady, Reyes. Is that her name? Yes, Jasmine Reyes. The judge heard all three people. Also, he listened to the testimony or heard and put into the record the testimony of the medical examiner. So you had these four components, right? Yes. Which one of those components do you suggest the trial judge misinterpreted? Or all of them? I would say that it's obvious from the record that he misinterpreted Cervantes' testimony. And I also believe that the trial judge – You think that Cervantes' testimony is the one that most supports your version of the facts? I believe Cervantes' and the medical examiner's testimony. And the medical – Yes. How can the medical examiner's testimony or record indicate asphyxiation, right? Yes, but I believe that – That means that there wasn't any cause of death by blows. Somebody strangled this guy or at least cut – if not strangled, cut off his ear. Right. And I believe that that is the exact – that he wasn't strangled. The defendant did not hold his foot strictly on the side of his neck and stand on it. That was not the testimony. The medical examiner said that he placed his foot to the front, that the particular hemorrhages show compression being applied to the chest and the neck area, which would go towards showing that he believed that he was holding him down. Rather than asphyxiating him. Rather than asphyxiating him. Rather than attempting to choke him out with his foot. And that's not what happened here. And the judge made the argument – I think I understand your position. Okay. Right. Anything further? You know, it's not what we would have done had we heard this testimony. You understand that. I do understand that. Do you want to sum up? Jones did not intentionally or knowingly kill Powell. He acted recklessly or in the heat of mutual combat. That's why this Court should reduce his conviction to involuntary manslaughter or second-degree murder. Thank you. Thank you, Mr. Williams. We'll give you an opportunity to respond after we've heard from Mr. Conner. Good morning, Counsel. Good morning. May it please the Court. You didn't write the brief, did you? No, sir, I did not. You cite the one case, People v. Austin. Yes, sir. But you do not address cases that were raised by the defendant. The cases raised by the defendant? Crenshaw? Gresham? Woods? Flores? None of them. To the extent that the people did not directly address those cases, this case comes squarely down to a review of the facts. So you don't need any case law to support your argument? He's got all of these cases in support of his argument. You rely on just Austin. Austin, again, was cited for the proposition to address the defendant's second argument. The first argument, where the people do put forth black-letter law, demonstrates the relevant verdicts. Well, he put some black-letter law on the table, too. Brackett, Crenshaw, Gresham all stand for the proposition, he says, that it's very unusual for a court to find first-degree murder when it's only combat involving fists. Again, that's the problem. I mean, he wasn't – Jones was not a professional boxer. We have those cases, of course, where a professional boxer's fists have been declared to be, you know, weapons. Yes. Again, the focus is not on whether or not it was a mutual combat of fists. The cause of death in this case, as Justice McBride noted – I beated you up on this brief because you didn't write it. No, I understand. But it really wasn't very helpful to us in that it doesn't try to distinguish any of the cases that he raises in his position. No, Your Honor. However, this Court is in a position to review the facts that are adduced below. You don't think the State's under an obligation to distinguish the cases he cites? Yes, Your Honor. The State is under an obligation to address those cases which have a bearing – But you didn't. No, Your Honor. The brief as filed – You didn't even say these cases don't have any bearing. You didn't even cite them. No, Your Honor. Those cases were not addressed in the people's brief. Okay. However, turning then to – Now having beaten up on you, go ahead. The question is whether or not the burden proof in this case, and more specifically the credibility findings, refute the claims raised by the defendant. And that's clearly what has occurred below. There was a great deal of consternation raised as to whether or not the defendant had knowledge or was practically certain as to whether his acts would cause harm. Now, the acts in question – Well, it's got to be death or great bodily harm. It's not just any old thing. It's death. Forgetting intent, if you go with the knowledge that the acts create strong probability of death or great bodily harm, that's the standard. That is the standard. In this case, it's clearly been satisfied as demonstrated on page K-112 of the record. Well, do you think that the average Joe knows that if you put your foot on somebody's neck for a minute  Now, the defendant admitted, again, on page K-112 of the record, when on cross-examination the prosecutor inquired, well, you thought that the victim was breathing. Yes. You thought that you could have got up and continued to fight. No, I didn't think he was getting up. The defendant knew at that very time he had rendered this man useless. Now, he attempted to say – All right, but what about Cervantes' testimony that he told the defendant while this was going on, particularly at that point where he was – Now I'm quoting from your brief. Cervantes then told the defendant that that was enough and that he was going to call the police because he believed the victim might have been a burglar. Yes. If he might have been a burglar, he was burglarizing Jones' apartment, wasn't he? Yes, that would have been the interpretation, but that goes directly to the questions with regards to – Well, if you're trying to hold down a guy you suspect of being a burglar, is that mitigating in any way? No, because this is not holding somebody down. Holding down the context in this case – Well, you know, depending on – I mean, I'm not suggesting that you could use deadly force to detain a burglar. We have cases that say you can't do that. But you could certainly use force to detain a burglar, couldn't you? Yes, you could, but in this case – And then it becomes a question of whether – what did he believe with respect to who Howell was? He wasn't sure that Howell was actually a paramour of his – Jones' girlfriend. Correct. He didn't know that, did he? No. Reyes didn't say anything about the relationship between Howell and herself. All she said was, let me explain. Correct. The only testimony came in was – I didn't know she had somebody. Jones could have believed, possibly, that Howell was a burglar. There was a speculation – Because that's what Cervantes thought he was. There was a speculation that it could have been that, because Jones purported to yell out of the landing, do you know who this guy is? Right. And he said, no, I don't. He yelled out to Cervantes, didn't he? Yes, that is correct. He was asking Cervantes to tell him whether he knew who this – Yes. He comes home and he finds this rather large guy in his apartment. Yes. Again, however – Well, Jones didn't testify that he thought the guy was a burglar, did he? No, Cervantes testified. Cervantes was asked. We're not really looking at what his intent was, are we? No, we are not. But do you have any cases that in any way support the facts here, that a few punches and then stepping on someone is traditionally a murder? Again, the people are not in a position to put forth a new case law. No, but the case law is pretty clear. Normally fights like this don't result in a murder finding, and you didn't cite anything that really contradicts that kind of executive law that's out there. This case can't be conceived of in the general concept of a fight of bare blows as cited to, I believe it's the Hudson case, the defendant relies upon where they indicated that there was mutual combat of blows and exchange and then a knife was used. This case would be no different if it was any other strangling case that was brought before the court. That's exactly what occurred. He didn't put his hands around his neck and try to choke him to death. That's not what happened here. You have an asphyxiation, which is the same thing as a strangling, which was accomplished by using the 240 pounds of the defendant's body weight against a prone victim who the defendant testified that he had knocked him down, watched the victim fall forward. The defendant then put his weight on the victim's throat and held the victim down. The fact that he used a foot does not render it anything less than strangling because he chose not to use his feet. Notably, the defendant on cross-examination refused to even acknowledge he used his feet at all. And this is a telling soul because he acknowledged the fact by claiming, I do not recall using my feet. That demonstrates the defendant's knowledge that he crossed the line. Yeah, and isn't that kind of what the judge ended up doing? He heard Cervantes, he heard Jones, and he basically didn't really believe Jones' account of how this all occurred. That's correct. More specifically, defendant has consistently, through the opening brief, maintained that the victim initiated the fight. The circuit court clearly, however, indicated both in its findings and in its motion for new trial, for the court to believe that the punch was thrown by the victim and the provocation for mutual combat existed at that time was not credible. So the question then becomes whether or not the credibility findings of the defendant testifying that this man swung on me in the stairwell of the apartment where nobody observed that, whether this court can overturn that credibility conviction. And as this court is well-determined, the credibility findings are matters for the circuit court. The circuit court determined that defendant's account was incredible. Yeah, well, isn't this, though, probably a case unlike any other? If you read the record, it does seem to be that Mr. Jones comes home to his home that he shares with his two children that he has with the woman who has just had sex in the apartment with the man that died. He walks in and he thinks that this is going on in his house. And, well, I mean, if you read the record, you could infer that. Well, you could infer that there was something going on with his girlfriend, with this man. If I may stop the court at that point in time. Didn't she testify that this, in fact, is what occurred? No, the victim, the defendant's relationship, the woman in the defendant's relationship did not testify as to that. In fact, in closing arguments. What did she say? What did she say she was doing there with this gentleman? She testified that, yes, they had a relationship. Okay. And what did she say that they had done that day or that they had done before that day? On two occasions they had had sex at that location. Okay. But you're saying that day she didn't say that they had sex? What I'm stressing is the fact that even in closing argument, on page L19 of the record. What did she say that they had done that day? Did she completely skirt that issue? Before the attack. Yes. The woman did not say anything. No, I'm not talking about what she said to Mr. Jones. I'm talking about what did she indicate had actually occurred. The people can see that she testified that they had had sex that day. So you're acting like there wasn't anything going on here, but the fact of the matter is if you read the entire record, you know that that's what had occurred, and there's a good chance that Mr. Jones had an idea that that had just occurred in his home. Not her home. In his home where he has his two children that he raises, but they're with this woman. She testified that she and Bryant Jones had an ongoing relationship. It wasn't that they were estranged, but she's having sex in this apartment, his apartment with another man. And then this Mr. Jones, you know, comes out of the bathroom and he says, who is this guy? What are you doing here? And, yeah, he did lose it. And then he chases him down the stairs, and then he starts beating on the man. But, you know, is there any case like this that the state could, you know, point to that says that this is your out-and-out murder? Well, initially I don't want to make to the court that we are suggesting that anything other than what happened, a consensual sexual encounter took place. That is not the people's position. However, what does need to be commented upon is the assertion made by defense counsel and then the belief that this corporate was operating under, that at the time of the attack, the defendant was inflamed by this belief that his girlfriend was engaged in a sexual relationship with somebody else. There is absolutely no testimony that that is what occurred. And, in fact, I would take it back to the closing argument at L-19. Counsel argues that the defendant. Okay, well, what's the other alternative? If he didn't, if he wasn't completely, if he wasn't aware of any kind of a sexual motive to the presence of the victim in his apartment, what would have been his other possible conclusion as a result of finding this guy there? The defendant testified that he doesn't have a conclusion. If we accept the defendant's testimony, I don't know what was happening. I wanted to find out more. That's why the defendant supposedly asked, who the fuck is this? Okay. Then the defendant says, I'm going to chase him downstairs. Right. At that point in time, the only consistent thread that we have heard. Could we conclude that he was reasonable in his assumption that the man's presence there was unauthorized? Yes. According to the victim, his girlfriend would not have otherwise been there without prior agreements. The way things went down, suddenly he comes out of the bathroom and discovers this man there, and there are no words from Ms. Reyes explaining his presence at that point. When the defendant initially exits the bathroom, but when the defendant initially exits the bathroom. Is it conceivable that the defendant thought that this man was an intruder, and maybe his girlfriend's life was in danger? The court would be speculating, but we do know that the victim. I grant you that. Maybe the defendant had the right to speculate. When you find somebody in your living room without any explanation, suddenly out of nowhere comes this rather large guy. 300 and how many pounds? The victim was 340. You just emerged from the bathroom thinking that the only two people in the apartment are you and your girlfriend, and you come out and there is this rather large guy. There is a large man attempting to exit the apartment, and that is what's key. Attempting to exit the apartment. He couldn't get the door open because he was apparently, according to the testimony, pulling in when he should have been pushing out. So there's no threat to the defendant's girlfriend at the time. Just a minute. There's no threat? You cannot assume that this man was on a mischievous mission. What's he supposed to assume when he comes out and sees this big guy trying to get out of the apartment? To speculate, that's what the defendant believed when he observed the person attempting to escape. Wait, wait. When you say speculate, here's where the problem is. What we do under the law is we have evidence and reasonable inferences from the evidence. So that's not speculation. I mean, Mr. Jones wasn't living in a vacuum. He sees somebody else in his apartment with his Pamela wife. You don't think he's a little disturbed about that? The people have never suggested the defendant would not have been disturbed by this. The question posed was whether or not I could speculate as to what was going through the defendant's mind. A reasonable man, a reasonable person, I don't care who it is, is going to be a little bit disturbed about that. Would he have been entitled to use a reasonable amount of force to detain the person until the police arrived? Presumably. The reasonable amount of force would have been a matter for the circuit court to determine whether that force was reasonable. I know we're not really sure that he really made that argument, but he thought. We know that Sir Bandy thought he was a burglar. Could you describe that? But we don't know that Jones thought he was a burglar. Could you describe recklessness as really going overboard? Recklessness is going overboard coupled with, and again the language there. And didn't he go overboard here? Going overboard. I know that those are not the legal words. I know that's not how we've defined recklessness through the cases, but could this conduct that occurred here be equally characterized as the height of recklessness in light of all the facts? And when someone's in his home that doesn't belong there and he reacts and he ends up, you know, trying to contain him and keep him there and then he holds him down with his foot, couldn't these facts equally support that recklessness? No, because recklessness does not entail the entire aspect of physically battering somebody. Well, if this had been a jury trial and they had asked for an involuntary manslaughter instruction, you as the state's attorney would say there was insufficient evidence to tender that instruction to the jury. Of course. That would have been your argument? That would have been the argument. Do you think you would have succeeded? What's the measure for tendering that instruction? The defendant is obligated to provide a scintilla of evidence, which would demonstrate the lesser intent in this case. How much evidence? A scintilla, a small modicum of evidence. Okay. That's also true of the second-degree murder charge, isn't it? If he had asked for a second-degree murder charge, alleging in his argument that there was sufficient credible evidence in the record for the prior fact to infer that maybe he thought this man was in a sexual relationship with his girlfriend and then in a sudden intense passion he decided to beat the guy up. Do I get a second-degree murder instruction to the jury on that basis, that argument? It's my understanding that the second-degree murder for a marital relationship does not cover a girlfriend. It does require a marriage. I know. So in that case it would not be available. I know. It requires adultery, doesn't it, for one thing? Yes. In this case it would not be available. So the only avenue left for the defendant was the mutual combat, which he did argue before the circuit court, which was evidently rejected. And, again, as Justice McBride pointed, there are four points within the circuit court's findings all clearly delineating, no, there was not mutual combat. But he argued involuntary manslaughter, too, didn't he? Yes, he did. And, again, that was also rejected. Based on recklessness. Yes. Again, both of those things. You don't feel that it's necessary to try to distinguish in any way the long line of cases that indicate that there's a presumption when you use a weapon that that shows the actor knows his ax creates strong probability of death. But that same kind of presumption doesn't apply when we have a situation involving blows and strikes, things of this sort. That is correct. The people don't challenge that that is the current standard of law. However, in this case, the notion, the people can see that a weapon was not used. The only weapon that was used was the defendant's foot, which asphyxiated the victim. Again, the notion that somehow his decision to not stick the dogs on him. Yes, I know, but there's not any long line of cases that you're relying on that say that putting your foot on somebody's neck, you know, supports a murder conviction. You didn't come up with anything that there's a long line of cases that shows us that when you put your foot on somebody's neck, you're strangling him? You didn't support any sort of position like that in the brief. Now, you're arguing it here today, but there aren't a long line of cases. I still haven't heard any cases. That support that the one case that was relied upon was an incident on a bus, wasn't it? Yes, where a gun was used and the poor bus driver took two from the gun and could hardly say that that's comparable to this case. In your defense, they raised Austin first. Right. But he only raised Austin because it contains a classic definition of what mutual combat is. And, of course, in Austin there was no mutual combat because the defendant had a gun and the bus driver had nothing but a transfer puncher. That's not mutual combat. At least the court so found, and I think the court so found correctly, that's the only reason he cited Austin. He didn't cite Austin for the suggestion that the facts were comparable. No. He has other cases for that which you didn't distinguish or even bother to rebut in any way. I would be happy to discuss the Woods case. It's a little late for that now. Okay. That's what the blue brief is supposed to contain. I understand, Your Honor. I know. I'm sorry to bring it up again. You want to sum up? Sure. Again, the issues raised by the defendant were both rejected below and the light was favorable to the prosecution, taking into consideration the credibility findings, more specifically the fact that the defendant's testimony was found incredible. We ask that this court affirm the defendant's conviction for first degree murder. Thank you very much. Mr. Whittier, this is the final word. Your Honors, I would just submit that this was a reckless act on Jones' part. I believe that the evidence shows that he came inside. He found a man in his apartment. There was some suggestions that the man told him that it was his fault that he was there. Although Jones did not know exactly why he was there, he tries to find out. And in the midst of doing that, a fight started. And in an attempt to hold him down at the end of that fight, he recklessly caused his death. If there are no more questions, I will submit this to your review. Mr. Williams, thank you. Thank you. Mr. Connors, thank you. Mr. Williams, welcome to the Appellate Court. I think you commended yourself well in your first appearance here. The case will be taken under advice. Thank you.